

1   Howard A. Janssen (State Bar No. 045385)
    Richard P. Doyle, Jr. (State Bar No. 112459)
2   JANSSEN DOYLE, LLP
    2540 Camino Diablo, Suite 220
3   Walnut Creek, CA 94597
    Telephone:    (925) 295-1805
4   Facsimile:    (925) 295-1801

5   René P. Tatro (Bar No. 78383)
    Juliet A. Markowitz (Bar No. 164038)
6   TATRO TEKOSKY SADWICK LLP
    660 South Figueroa Street, Suite 1450
7   Los Angeles California 90017
    Telephone: (213) 225-7171
8   Facsimile: (213) 225-7151

9   Attorney for Plaintiffs/Relators

10                  UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                                          **CRB**

    United States of America, ex rel. UNDER      C 06 6303
13  SEAL,                                        Civil Action No:

14                     Plaintiff/Relators,       **COMPLAINT FOR DAMAGES (FALSE
                                                 CLAIMS ACT, 31 U.S.C. § 3729 et seq.);**
15      vs.                                      **AND DEMAND FOR JURY**

16  UNDER SEAL,                                  FALSE CLAIMS ACT
                                                 (31 U.S.C. § 3730 et seq.)
17                     Defendants.

18

19

20

21

22

23

24

25

26

27

28

                                    1

1   Howard A. Janssen (State Bar No. 045385)
    Richard P. Doyle, Jr. (State Bar No. 112459)
2   JANSSEN DOYLE, LLP
    2540 Camino Diablo, Suite 220
3   Walnut Creek, CA 94597
    Telephone:    (925) 295-1805
4   Facsimile:    (925) 295-1801

5   René P. Tatro (Bar No. 78383)
    Juliet A. Markowitz (Bar No. 164038)
6   TATRO TEKOSKY SADWICK LLP
    660 South Figueroa Street, Suite 1450
7   Los Angeles California 90017
    Telephone: (213) 225-7171
8   Facsimile: (213) 225-7151

9   Attorney for Plaintiffs/Relators

10              UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13  United States of America, ex rel. Robert        Civil Action No:
    Lalley, Courtney Davis and William
    Manos, individuals,
14

15                    Plaintiff                      **COMPLAINT FOR DAMAGES (FALSE
                                                     CLAIMS ACT, 31 U.S.C. § 3729** *et seq.***);
16      vs.                                          AND DEMAND FOR JURY**

17  Novartis Vaccines and Diagnostics, Inc.;
    and Express Scripts, Inc. (fdba Priority
18  Healthcare Corporation),

19                   Defendants.

20          Plaintiff United States of America ex rel. Robert M. Lalley, Courtney Davis and William

21  Manos (hereafter, "Qui Tam Plaintiffs/Relators"), complaining of the defendants Novartis

22  Vaccines and Diagnostics, Inc. and Express Scripts, Inc. (collectively, "Defendants"), for their

23  complaint allege:

24                    **JURISDICTION AND THE PARTIES**

25      1.      Qui Tam Plaintiff/Relator Robert M. Lalley was Director of National Accounts

26  for Chiron Corporation, and resides at 1052 Greymoor Road, Birmingham, AL 35242.

27      2.      Qui Tam Plaintiff/Relator Courtney Davis was a National Account Manager for

28  Chiron Corporation and resides at 248 Valley Street, Pembroke, MA 02359

                                        1

JANSSEN DOYLE, LLP

3.      Qui Tam Plaintiff/Relator William Manos was Chiron Corporation's Area Business Manager – Los Angeles North and resides at 24140 Mentry Drive, Santa Clarita, CA 91321-3947.

4.      Defendant Novartis Vaccines and Diagnostics, Inc. ("Novartis") is a Delaware corporation which has its principal place of business in New Jersey.  Chiron Corporation ("Chiron"), which was acquired by Novartis, has its principal place of business in Emeryville, CA.  Both are referred to collectively herein as "Chiron."

5.      Defendant Express Scripts, Inc. ("Express Scripts") is a Delaware corporation which has its principal place of business in St. Louis, MO.  Priority Healthcare Corporation ("Priority Healthcare"), the entity referred to herein, was acquired by Express Scripts, Inc.  Both are referred to collectively herein as Priority Healthcare.

6.      Defendant Novartis (and its predecessor, Chiron) is and was in the business, among other things, of manufacturing and promoting a pharmaceutical drug known as tobramycin under the trademark TOBI.

7.      Defendant Express Scripts (and its predecessor Priority Healthcare) is and was in the business, among other things, of obtaining government reimbursement for Chiron's off-label prescriptions of TOBI, as herein described.

8.      This Court has jurisdiction over this matter pursuant to the False Claims Act, particularly 31 U.S.C. § 3730(b), in that the claims for relief there under set forth in this action are brought by private persons in the name of the United States government; this Court further has federal question jurisdiction over this matter pursuant to 28 U.S.C.A. § 1331.

9.      Venue is proper pursuant to 28 U.S.C. § 1391(a), in that defendant Novartis conducts business in this judicial district, and the other defendants resided in this judicial district at the time of the activities pled in this Complaint.

10.     As required under the False Claims Act, 31 U.S.C. § 3730(a)(2), the Relators have provided to the United States Attorney for the Northern District of California a statement of material evidence and information related to this Complaint. This is a case where Defendants improperly created a demand for a pharmaceutical product manufactured by Chiron under the

JANSSEN DOYLE, LLP

2

1    trademark TOBI through violations of the Food, Drug, and Cosmetics Act ("FDCA"), then

2    submitted to the government for reimbursement bills from the sale of the product, not otherwise

3    payable, without disclosing to the government that the demand had been generated through

4    violations of the FDCA.

5        11.    Under the FDCA, pharmaceutical drug companies cannot distribute a drug in

6    interstate commerce unless the Food and Drug Administration ("FDA") has approved its use.

7    The FDA approves pharmaceutical drugs for marketing for one or more specific uses, and

8    establishes recommended dosages for those uses.  When the FDA approves a drug for marketing

9    and sale, it also approves the labeling for the drug, which explains the manner in which the

10   medication may be marketed as safe and effective.  Use of an approved drug for any purpose

11   other than those specifically contained in the label is referred to as an "off-label" use.

12       12.    The FDCA does not prohibit physicians from prescribing an FDA approved drug

13   for off-label uses.  The FDCA does, however (except in certain situations not relevant here),

14   prohibit drug manufacturers from marketing or promoting a drug for off-label uses, pursuant to

15   statutory authority including 21 U.S.C. §§ 331 and 352.

16       13.    While physicians may and do prescribe drugs for uses other than uses contained

17   in the label, a pharmaceutical company, such as Chiron, may not promote a product as safe and

18   effective beyond its indicated use.

19       14.    Pursuant to 42 U.S.C. § 1396r-8(k)(3), federal and state health care programs,

20   such as Medicaid and Medicare, have strict limitations on the circumstances under which they

21   will reimburse the cost of drugs prescribed for off-label uses.

## BACKGROUND AS TO TOBI

23       15.    This Complaint concerns the promotion and sale of a pharmaceutical known as

24   TOBI, which is approved for the treatment of a particular type of lung infection in certain

25   patients with cystic fibrosis.

26       16.    Cystic fibrosis (hereafter "CF") is a genetic disease affecting approximately

27   30,000 children and adults in the United States.  CF causes the body to produce abnormally

28   thick, sticky mucus that clogs the lungs and obstructs the pancreas.  According to the CF

3

JANSSEN DOYLE, LLP

1  Foundation's National Patient Registry, the median age of survival for a person with CF is 33.4

2  years.

3      17.   In the late 1990s, PathoGenesis Corporation of Seattle, Washington

4  ("PathoGenesis") developed TOBI as tobramycin for inhalation.  In particular, on December 22,

5  1997, the U.S. Food and Drug Administration approved TOBI for marketing and sale under new

6  drug application NDA 50-753 as a drug device combination for the management of P. aeruginosa

7  in certain CF patients.

8      18.   The FDA-approved version of TOBI was a 300 mg solution of tobramycin as 60

9  mg/ml in 5 ml in 0.225 N saline for inhalation administered via a particular nebulizer (the Pari

10  LC Plus jet nebulizer) using a particular power source to create the aerosol (the DeVillbus

11  Pulmoaide compressor).

12      19.   In particular, TOBI was approved for marketing and sale following clinical trials

13  of patients chronically infected with the bacteria P. aeruginosa, who were otherwise stable upon

14  admission into the trial, having lung functions between 25% and 75% predicted and who were 6

15  years of age and older.

16      20.   TOBI immediately became the industry standard for the management of P.

17  aeruginosa in CF patients when using a tobramycin solution for inhalation.

18      21.   The FDA's approval prohibits, without deviation, the marketing of TOBI through

19  advertising or representations regarding any of the following:

20      a.   The safety and efficacy of any dose other than 300 mg as 60 mg/ml in 5 ml,

21      b.   The use of TOBI with any nebulizer delivery system other than the PARI LC

22          Plus jet nebulizer and the DeVillbus Pulmoaide compressor,

23      c.   The use of TOBI by children under the age of 6,

24      d.   The use of TOBI in patients with lung function greater than 75%,

25      e.   The use of TOBI in patients not chronically infected with P. aeruginosa, and

26      f.   The use of TOBI for non-CF patients.

JANSSEN DOYLE, LLP

COMPLAINT FOR DAMAGES (FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et seq.*);
AND DEMAND FOR JURY

1  **BACKGROUND AS TO THE** QUI TAM PLAINTIFF/RELATORS

2      22.    Chiron acquired PathoGenesis on or about August 14, 2000 and thereby acquired

3  the rights to TOBI.

4      23.    Thereafter, Chiron entered into employment agreements with each of the Relators

5  whereby the Relators, as employees, were to render professional services, including the

6  promotion and sale of TOBI, as well as obtaining payment by the U.S. Government through its

7  federal assistance programs, primarily related to TOBI.

8      24.    Reimbursement issues related to TOBI included fact that the price of TOBI is

9  significantly higher than the price of generic tobramycin that might be prescribed and used for

10  inhalation.

11      25.    During their employment, the Relators attended sales meetings in which they and

12  the Chiron sales force were instructed by Chiron to promote off-label uses of TOBI.

13      26.    During their employment, the Relators learned of fraudulent activities by

14  Defendants with respect to reimbursement for off-label uses of TOBI, as described below.

15      27.    In particular, Chiron implemented a strategic marketing plan such that TOBI

16  would be aggressively marketed to treat a wide array of ailments for which, and patients for

17  whom, the FDA did not approve the drug as safe and effective.  In particular, the company

18  promoted TOBI for the treatment of lung diseases not associated with CF, including

19  bronchiectasis ("BE") and ventilator assisted pneumonia ("VAP"), and promoted TOBI as a

20  first-line treatment for children not chronically infected with P. aeruginosa and/or with lung

21  function greater than 75% ("Early Intervention"), and for those below the age of six ("Under

22  Six"), as a means to increase its sales of TOBI.

23      28.    In 2002, Chiron hired David Happel, who had a known history of involvement

24  with alleged improper marketing and promotion for off-label use of pharmaceutical drugs.  For

25  example, Mr. Happel had managed a business, which the Department of Justice investigated, and

26  later sued, for improper marketing and promotion of pharmaceuticals for off-label use.

27      29.    Shortly after Mr. Happel joined Chiron, the company implemented new off-label

28  promotion and marketing policies for TOBI.  Mr. Happel also developed a team of managers to

5

JANSSEN DOYLE, LLP

1    assist in the sales and promotion of off-label uses for TOBI.

2         30.    Jennifer Stroman, a Chiron employee, was promoted to Product Manager in 2002.

3    By organizational structure, Ms. Stroman reported directly to Brian Unger, Pulmonology Product

4    Director, but in practice reported to Mr. Happel.

5         31.    Ms. Stroman was in charge of development and implementation of TOBI speaker

6    programs.  She also provided direct instruction to the sales representatives through memoranda,

7    training directives, and presentations as to how they were to promote the programs and services

8    described herein.

9         32.    Burt Kiethley, a Chiron employee, was in charge of the Pulmonology sales group

10   in 2005.  Under his direction, sales representatives were required to conduct the off-label sales

11   campaign developed and directed by Mr. Happel and Ms. Stroman.

12        33.    Joe Regan, a Chiron employee, was the acting Vice President of BioPharma Sales

13   (Oncology & Pulmonology) from October 2004 to December 2005.  Under his watch, sales

14   representatives were directed to conduct the off-label sales campaign previously described.  Mr.

15   Regan authorized and directed the Chiron oncology sales representatives to be trained to sell

16   TOBI, and had them make direct sales calls to non-CF physicians to sell TOBI.

17        34.    Chiron's strategy was to enhance the demand for TOBI through violations of the

18   FDCA.  This demand, which was the result of illegal, fraudulent and improper activity by

19   Chiron, in turn resulted in the false claims complained of herein.  Chiron's tactics included the

20   following, among other things:

21        a.    Chiron's business plans and incentive programs were to market and

22        promote TOBI (and thereby increase it sales) for off-label applications.

23        b.    Toward this end, Chiron promoted selling TOBI to Office Based

24        Pulmonologists ("OBP").  OBP sales, by their very nature, are known to be heavily

25        weighted toward off-label uses, since Office Based Pulmonologists generally do not treat

26        CF patients.  Most CF patients are treated at CF centers, not by Office Based

27        Pulmonologists.

28

JANSSEN DOYLE, LLP

6

COMPLAINT FOR DAMAGES (FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et seq.*);
AND DEMAND FOR JURY

c.      As part of, and to further, its illegal marketing and promotion scheme, Chiron provided to its sales representatives lists of potential doctors, typically pulmonologists, who did not have exclusively CF patients.  Again, by targeting this doctor base, Chiron knew that most, if not all, of the prescription demand generated thereby would be off-label.

d.      As part of, and to further, its illegal marketing and promotion scheme, Chiron provided training to its sales representatives in the off-label disease conditions to be targeted with TOBI.  This training included, among other things, providing sales representatives with studies about off-label uses of TOBI (which the sales representatives were told to destroy or return to Chiron after review).  The training also included scripted inquiries in which the sales representatives were coached to engage physicians in discussions regarding off-label applications.  The training also included presentations to coach the sales representatives in how to guide the off-label discussions with physicians.

e.      To facilitate these illicit sales, Chiron created a special database, called EDGE, for use by sales representatives.  The database contained data on doctors so Chiron could track the success of its off-label sales and activities.  The database was managed by Chiron's sales operations unit and marketing department.

f.      As part of, and to further, its illegal marketing and promotion scheme, Chiron's sales representatives were taught to, and did, hide off-label promotions in the EDGE computer database by calling those activities "OBP."

g.      Because Chiron knew that getting reimbursement from governmental agencies for off-label prescriptions was difficult (but necessary to monetize its scheme, since the cost of TOBI was too high – $3,000 to $4,000 *per month* – for most consumers to bear without reimbursement), to reap the benefits of its efforts to artificially and illegally enhance the demand for TOBI in off-label applications (and to snowball that demand even further), Chiron needed to take steps to assure that the largest volume possible of its burgeoning off-label demand was reimbursed by governmental agencies. For that reason, and as part of, and to further, its illegal marketing and promotion scheme,

7

JANSSEN DOYLE, LLP

1    Chiron orchestrated a scheme whereby Defendant Express Scripts, dba Priority

2    Healthcare, which specialized (among other things) in facilitating reimbursement requests

3    to governmental agencies for off-label prescriptions, was retained to assist Chiron's sales

4    representatives who were dealing with patients who had received prescriptions for

5    predominately off-label uses.  The sales representatives were urged by Chiron to tell

6    these patients to process their prescriptions through Priority Healthcare.

7         h.    As part of, and to further, its illegal marketing and promotion scheme,

8    Chiron encouraged its sales representatives to provide one-on-one sales pitches to

9    physicians about off-label uses of TOBI, in the absence of prior inquiry concerning such

10   uses by doctors.

11        i.    As part of, and to further, its illegal marketing and promotion scheme,

12   Chiron provided its sales representatives with marketing materials (some of which were

13   called, ironically – but accurately – "cheat sheets") about off-label promotion.  Chiron

14   also instructed its sales people to destroy and or to return certain of those documents to

15   Chiron management.

16        j.    As part of, and to further, its illegal marketing and promotion scheme,

17   Chiron required as a condition of continued employment that its sales representatives

18   make non-CF or OBP sales calls.  Chiron required sales persons to spend 10% to 30% of

19   their time calling on physicians in off-label areas, such as OBPs and non-CF center

20   physicians who were unlikely to have CF patients or to have CF patients for whom TOBI

21   had been approved by the FDA.

22        k.    As part of, and to further, its illegal marketing and promotion scheme,

23   Chiron provided monetary incentives to sales representatives to participate in off-label

24   promotion of TOBI through the use of reimbursement forms (known as "BIRFs"), which

25   became a marketing program that paid incentives to sales persons for increased sales due

26   to off-label promotion.

27        l.    As a further part of its scheme to illegally enhance demand for TOBI by

28   off-label marketing and promotion, when Chiron sales representatives approached the

8

COMPLAINT FOR DAMAGES (FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et seq.*);
AND DEMAND FOR JURY

JANSSEN DOYLE, LLP

1    physician community to promote off-label uses (as the sales representatives were

2    required to do), they were instructed by Chiron to "hook" the OBP by providing free

3    samples of TOBI for patients to try for off-label uses. These free sample programs for

4    off-label uses sometimes were referred to as Professional Courtesy Packages. The

5    purpose was to induce physicians to develop a sufficient comfort level with TOBI for off-

6    label indications that the doctors would prescribe it for such purposes.

7          m.      As part of, and to further, its illegal marketing and promotion scheme,

8    Chiron instructed its sales representatives to present physicians with papers (or

9    information about such papers) on BE and VAP. TOBI is not approved for management

10    of either of these diseases. Moreover, these diseases are not unique to CF victims. As

11    part of its instructional program to illegally enhance the demand for TOBI through off-

12    label marketing and promotion, Chiron conducted role-playing discussions with its sales

13    people prior to sales calls for off-label indications.

14          n.      As part of, and to further, its illegal marketing and promotion scheme,

15    Chiron instructed its sales people to tell doctors that TOBI reduces hospital stays and

16    reduces exacerbations in patients hospitalized for respiratory problems, but did not

17    instruct its sales representatives to expressly qualify that as being in connection with the

18    management of P. aeruginosa in CF patients within a specific age range and within a

19    specific lung function range. Chiron also instructed its sales representatives to tell

20    doctors that TOBI has studies in CF and demonstrated a successful track record, but did

21    not instruct its sales representatives to expressly qualify that as a being in connection with

22    the management of P. aeruginosa in CF patients within a specific age range and within a

23    specific lung function range. Chiron also instructed its sales representatives to explain to

24    doctors – including those such as OBPs and non-CF center doctors who were known to

25    be unlikely to be managing P. aeruginosa in CF patients of the approved age range and

26    lung function range – that while TOBI was more expensive, it would save money based

27    on the length of stay at hospitals and frequency of stays in hospitals.

28

JANSSEN DOYLE, LLP

COMPLAINT FOR DAMAGES (FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et seq.*);
AND DEMAND FOR JURY

o.      As part of, and to further, its illegal marketing and promotion scheme,
Chiron conducted sales meetings where off-label sales of TOBI were reported, discussed,
and promoted.

p.      As part of, and to further, its illegal marketing and promotion scheme,
Chiron required its sales persons to profile physicians in off-label areas such as BE and
newborns with pseudomonas lung infections.

q.      As part of, and to further, its illegal marketing and promotion scheme,
Chiron made false or misleading statements to health care professionals regarding
TOBI's efficacy for off-label uses, by representing that TOBI's safety within its
indication implied that it was safe for other indications.  If a physician pressed with a
question about whether TOBI had been approved by the FDA for such off-label uses,
Chiron instructed its sales representatives to respond by providing a clinical trial that
occurred with TOBI in BE and a clinical retrospective study in VAP, both of which were
sponsored by Chiron, and neither of which had been vetted with the FDA or submitted to
the FDA in connection with efforts to get TOBI approved for such off-label uses.  For
example, Chiron initiated a phase two safety study to determine if TOBI can improve the
symptoms of extreme BE.  The initial results showed that TOBI did not provide the same
benefits in patients with BE as seen in patients as studied with CF. This distinction was
not shared with physicians whom Chiron was encouraging to prescribe TOBI for off-
label indications.

r.      As part of, and to further, its illegal marketing and promotion scheme,
Chiron sponsored purportedly "independent medical education" events facilitating and
encouraging off-label TOBI uses with extensive input from Chiron regarding topics,
speakers, content, and participants.

35.     Chiron also assisted in obtaining federal reimbursement for these off-label
indications, which it had actively promoted, in a false and misleading manner.  These activities
have included:

COMPLAINT FOR DAMAGES (FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et seq.*);
AND DEMAND FOR JURY

JANSSEN DOYLE, LLP

a.  Institutionalizing sales of off-label uses of TOBI by maintaining and providing forecasts for both CF uses and non-CF uses of TOBI.  To meet sales expectations it was necessary to promote and sell TOBI for off-label uses.  In other words, sales representatives were expected to sell a certain number of cartons of TOBI for both CF and non-CF indications.

b.  Contracting with Priority Healthcare to assist doctors in obtaining reimbursement, and, in particular, improperly to obtain federal reimbursement for the off-label uses of TOBI.

c.  Working with Priority Healthcare to gain "adjudication" (reimbursement) for off-label prescriptions, including off-label prescriptions generated through the illegal and improper marketing and advertising of TOBI, which was not disclosed to the government.

36.  These tactics were part of a widespread, coordinated, national effort to implement an off-label marketing plan and create a demand for TOBI which would not have existed had Chiron complied with the FDCA.  Many of the TOBI sales thus generated were submitted to the government for reimbursement, without disclosing their false and fraudulent nature:  that is, that the reimbursement submissions were for prohibited off-label uses, and that these uses had been knowingly, unlawfully and fraudulently promoted and marketed by Chiron. At the same time it was engaging in the aforementioned conduct, Chiron decided not to seek FDA approval for any of the off-label uses and, in fact, abandoned scientific research related to such uses.

37.  While Chiron was engaging in the acts complained of herein resulting in false claims being submitted for reimbursement, it also was drastically increasing the price of the product, which, of course, materially increased the amount of the false claims and damages flowing there from.  Since it bought PathoGenesis, Chiron has doubled the wholesale price of TOBI through 5-6% average price increases every six months.  Thus the wholesale price of TOBI for a month supply today is over $3,500.

38.  In or about the Fall of 2005, Relator Robert Lalley had knowledge that Chiron's conduct, as set forth above, was a violation of Federal law, and that it was thereby falsely and

11

JANSSEN DOYLE, LLP

1 fraudulently generating a demand for prescriptions which were then submitted to the government

2 for reimbursement through federal assistance programs.  At that time, Relator Robert Lalley

3 verbally informed Chiron, and Mr. Happel, individually and in his sales capacity, that the

4 conduct of Chiron, as described above, was illegal and improper.

5      39.    In response, Relator Robert Lalley's employment reviews were retroactively

6 changed, and he was fired, which were acts of retaliation.

7      40.    Similarly, Relator William Manos' employment was terminated, as part of a

8 redistricting, after he raised the issue of off-label sales.  This was done as an act of retaliation.

9      41.    At all times material to this Complaint, Defendants knew, or were grossly

10 negligent or reckless in not knowing, that their conduct as described herein was illegal and

11 improper.

12      42.    On information and belief, Defendants knowingly, as that term is defined by 31

13 U.S.C. § 3729(b), filed or caused to be filed with the federal government applications for the

14 payment of United States government funds, and, on information and belief, caused moneys of

15 the United States government to be paid to themselves for reimbursement of TOBI for off-label

16 uses which they illegally promoted, as described herein.

17 **FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS**

18 **(Violation of 31 U.S.C. § 3729(a)(1))**

19      43.    The Qui Tam Plaintiff/Relators repeat the allegations of Paragraphs 1 - 42

20 contained in this Complaint.

21      44.    Defendants presented to, or caused to be filed with, the United States government

22 claims with knowledge of their falsity, or with grossly negligent or reckless disregard of facts

23 and conditions that would indicate that the reimbursement claims were inaccurate or

24 inappropriate and false, and caused payments for the reimbursement claims to be made by the

25 United States government.

26      45.    Defendants' illegal and improper conduct, as described herein, also deprived

27 federal assistance programs across the country of the informed, impartial judgment of medical

28 professionals – judgment on which the programs rely to allocate scarce financial resources to

JANSSEN DOYLE, LLP

1    provide necessary and appropriate care.

2        46.    In addition to the specifics set forth above, Defendants' conduct included

3    recruiting doctors to influence other physicians and developing research solely to boost market

4    share and the total value of the sales of TOBI, which was done without proper disclosure of the

5    financial relationship between the doctor and Chiron.  For example, Chiron's involvement with

6    clinical trials, medical journal research and reviews, educational grants and continuing medical

7    education was provided, in part, to obtain the assistance of doctors in the prescription of TOBI

8    for off-label applications.

9        47.    As a consequence of Defendants' unlawful scheme, patients who received the

10   drug for unapproved and unproven uses (which uses were then submitted for reimbursement by

11   government assistance programs such as Medicare) had no assurance that their doctors were

12   exercising their independent and fully-informed medical judgment, or whether the doctor was

13   instead influenced by misleading statements made by, or inducements provided by, Defendants.

14       48.    By reason of the violation of 31 U.S.C. § 3729(a)(1), Defendants have knowingly

15   or recklessly damaged the United States government in an as yet undetermined amount in an

16   amount in excess of $100,000,000.00.

17            **SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS**

18                **(Violation of 31 U.S.C. § 3729(a)(2))**

19       49.    The Qui Tam Plaintiff/Relators repeat the allegation of Paragraphs 1- 48

20   contained in this Complaint.

21       50.    Defendants presented claims to, or caused claims to be filed with, the United

22   States government with knowledge of their falsity, or with grossly negligent or reckless disregard

23   to facts and conditions that would indicate that the reimbursement claims were inaccurate or

24   inappropriate and false, and caused payments for the reimbursement claims to be made by the

25   United States government.

26       51.    By its conduct as described herein, Chiron subjected the poor, the elderly, the

27   very young and other persons insured by state and federal health care programs to experimental

28   drug applications which have not been determined to be safe and effective by enlisting

JANSSEN DOYLE, LLP

13

1    physicians to promote off-label uses of TOBI.

2         52.    Chiron employed Priority Healthcare to assist in obtaining reimbursement for off-

3    label use of TOBI. Priority Healthcare knowingly presented, or caused to be presented, to the

4    United States Government false or fraudulent claims for payment or approval of TOBI for these

5    off-label applications which had been generated through Chiron's improper and illegal marketing

6    scheme.

7         53.    Priority Healthcare knowingly makes, uses, or causes to be made or used, a false

8    record or statement to get a false or fraudulent claim paid or approved by the United States

9    government for the off-label applications of TOBI, which had been generated through Chiron's

10   improper and illegal marketing scheme.

11        54.    By reason of the violation of 31 U.S.C. § 3729(a)(2), Defendants have knowingly

12   or recklessly damaged the United States government in an as yet undetermined amount.

**THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS**

**(Violation of 31 U.S.C. § 3729(a)(3))**

15        55.    Qui Tam Plaintiff/Relators repeat the allegations of Paragraphs 1 - 54 contained in

16   this Complaint.

17        56.    The Defendants, in performing the acts set forth above, conspired to defraud the

18   United States government in violation of 31 U.S.C. § 3729(a)(3) by getting false or fraudulent

19   claims allowed or paid to the damage of the United States government.

**PRAYER FOR RELIEF**

21        57.    WHEREFORE, Plaintiff, United States of America ex rel. Relators Robert M.

22   Lalley, Courtney Davis and William Manos prays that judgment be entered against Defendants,

23   and each of them jointly and severally, for damages and otherwiseas follows:

24             a.    In an amount, presently indeterminable, but in excess of

25   $100,000,000.00, on the First, Second and Third Claims, for violation of 31 U.S.C. §

26   3729(a)(1), (2) and (3); and that such sum be duly trebled, in addition to a fine of not less

27   than $5,000 per violation and not more than $10,000, together with attorneys' fees and

28   costs;

JANSSEN DOYLE, LLP

1          b.          In addition, Plaintiffs pray for such further and additional relief at law

2     or in equity that this Court may deem appropriate or proper.

3                                   **JURY DEMAND**

4          Plaintiffs and Qui Tam Plaintiff/Relators demand a trial by jury on all issues so triable.

5

6     Dated:  October 6, 2006

7                                              Respectfully submitted,

8                                              By: _____
                                                     Rene Tatro

9

10                                             By: _____
                                                     Richard P. Doyle, Jr.

11                                                   Attorneys for Plaintiff,

12                                                   United States of America ex rel.
                                                     and

13                                                   Plaintiffs/Relators

14                                                   Robert M. Lalley,
                                                     Courtney Davis and

15                                                   William Manos

16

17

18

19

20

21

22

23

24

25

26

27

28

JANSSEN DOYLE, LLP

15

1  Howard A. Janssen (State Bar No. 045385)
   Richard P. Doyle, Jr. (State Bar No. 112459)
2  JANSSEN DOYLE, LLP
   2540 Camino Diablo, Suite 220
3  Walnut Creek, CA  94597
   Telephone:    (925) 295-1805
4  Facsimile:    (925) 295-1801

5  René P. Tatro (Bar No. 78383)
   Juliet A. Markowitz (Bar No. 164038)
6  TATRO TEKOSKY SADWICK LLP
   660 South Figueroa Street, Suite 1450
7  Los Angeles California  90017
   Telephone: (213) 225-7171
8  Facsimile: (213) 225-7151

9  Attorney for Plaintiffs/Relators

10            UNITED STATES DISTRICT COURT

11        FOR THE NORTHERN DISTRICT OF CALIFORNIA

12  United States of America, ex rel. UNDER     Civil Action No:
    SEAL,
13
              Plaintiff/Relators,
14                                              **PROOF OF SERVICE**
       vs.
15
    UNDER SEAL,
16
              Defendants.
17

-1-
PROOF OF SERVICE

## PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. I am employed in the office of a member of the bar of this court at whose direction the service was made. My business address is JANSSEN DOYLE LLP, 2540 Camino Diablo, Suite 220,Walnut Creek, CA, 94597. On **October 6, 2006,** I served the following document(s) by the method indicated below:

**COMPLAINT FOR DAMAGES (FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et seq.*); AND DEMAND FOR JURY**

( )  by transmitting via facsimile on this date from fax number (925) 295-1801 the document(s) listed above to the fax number(s) set forth below. The transmission was completed before 5:00 p.m. and was reported complete and without error. The transmission report, which is attached to this proof of service, was properly issued by the transmitting fax machine. Service by fax was made by agreement of the parties, confirmed in writing.

(X)  VIA HAND DELIVERY

( )  by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Walnut Creek, California addressed as set forth below. I am readily familiar with the firm's practice of collection and processing of correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in this Declaration.

Michael Wong
Chief of White Collar Crimes
United States Attorneys' Office
Northern District
450 Golden Gate, 11th Floor
San Francisco, CA  94102-3495

I declare under penalty of perjury under the laws of the United States that the above is true and correct. Executed at Walnut Creek, California on **October 6, 2006.**

Renee C. Beverly

-2-

PROOF OF SERVICE